PARTEE v. CRAWFORD et al.

(Division B. Sept. 30, 1935.)

[163 So. 389. No. 31804.]

Brewer & Montgomery, of Clarksdale, for appellant.

734

Maynard, FitzGerald & Venable, of Clarksdale, for appellees.

736

Argued orally by **Fred H. Montgomery**, for appellant, and by **John W. McCall**, for appellee.

**Anderson, J.,** delivered the opinion of the court.

This is a foreign attachment in chancery. It was begun by appellant, Partee, on the equity side of the county court of Quitman county. He filed his bill in that court against appellee Crawford, a nonresident, making Thomas a resident garnishee defendant. Partee sued for the sum of eight hundred fifty dollars which he claimed Crawford owed him for his services as a real estate agent in effecting a sale for Crawford to one Wallis of three hundred forty acres of land in Quitman county. Thomas was indebted to Crawford. Appellant sought to establish his alleged debt against Crawford and subject to its payment a sufficiency of the amount due Crawford by Thomas to pay it. Appellant recovered a decree in the county court, from which appellee Crawford appealed to the circuit court, where there was a trial resulting in judgment in his favor dismissing appellant's bill. From that decree appellant prosecutes this appeal.

There is little, if any, dispute as to the material facts. Crawford's home was in Memphis, Tenn. He owned three hundred forty acres of land in Quitman county in this state, which he desired to sell. Partee was a real estate agent, with his home and office in Memphis, Tenn. Wallis was vice president of a bank at Clarksdale in this state, where he also had his home. Dalton was a real estate agent at Clarksdale. Roy Flowers resided in that section of the state. On February 5, 1934, Crawford and Wallis entered into a written contract, by the terms of which the latter was to purchase from the former his three hundred forty acres of land in Quitman county, for which he was to pay the sum of seventeen thousand dollars, one thousand dollars in cash

(which was put up by Wallis as earnest money at the time), four thousand dollars on delivery of deed, and the balance in deferred installments. The contract had the usual provision for abstract of title. The contract of sale was brought about by Partee and others acting with him, as will more fully appear. On the same day this contract was executed Partee and Crawford entered into a contract in writing, by the terms of which Crawford agreed to pay Partee eight hundred fifty dollars for making the sale to Wallis, and in addition not more than twenty-five dollars for procuring an abstract of title to the land; four hundred twenty-five dollars of the commission was to be paid on the consummation of the sale; and four hundred twenty-five dollars by Wallis out of the deferred purchase-money installments. The contract provided further: "It is also agreed and understood between parties of the first part and Charles W. Partee, that the one thousand dollars earnest money put up by J. O. Wallis is to be forfeited to Treadwell B. Crawford and Mrs. Treadwell B. Crawford in case the said J. O. Wallis does not go through with his part of the contract, and parties of the first part will not owe Charles W. Partee, Agent, any commission whatsoever, out of this one thousand dollars earnest money. In other words, if this sale is not consummated the said Charles W. Partee will not receive any commission or compensation whatsoever, but all earnest money will be forfeited to parties of the first part."

Partee and Dalton, the real estate agent at Clarksdale, appear to have been acting together in the matter of the sale. The real purchaser of the land was Flowers; Wallis was a mere figurehead—a mere conduit for the title to pass from Crawford to Flowers. Flowers put up the cash payment of one thousand dollars which Wallis was to forfeit if he refused to go through with the sale. This, however, was unknown to Crawford until the time came for the consummation of the sale. Wallis

signed the contract without reading it carefully; his only interest in the matter was to aid Flowers in purchasing the land. Crawford was not willing to sell the land to Flowers, and, if he had known that Flowers was the real purchaser and not Wallis, he would not have signed the contract of sale. When the time came for the consummation of the sale by delivery of the deed and the making of the cash payment on the purchase money and the giving of notes for the deferred payments, Wallis refused to go through with it. The evidence to that effect was undisputed. Crawford went to Clarksdale and saw him about the matter and insisted that the sale be consummated. Wallis declined. He stated to Crawford the real facts about the matter; that the contract of sale was for Flowers and not for him. Crawford thereupon returned to Wallis the earnest money of one thousand dollars, and proceeded to sell the land to Thomas, the garnishee defendant. That sale was consummated.

The provision in the brokerage contract, above quoted, could mean nothing else except that, if Wallis refused to consummate the sale, as he did, Partee would receive no commission whatsoever for his services. Concede, for the sake of argument, that Crawford could have gone into the courts and forced Wallis to consummate the sale, still under the contract Crawford was not required to pursue that course. The contract provided for that contingency. After Wallis refused, Crawford had the right to treat the contract as at an end. In doing so his contract with Partee provided against any liability for commissions. In other words, Crawford had the right to provide, as he did, that he should not be liable for the commission if he were forced to resort to the courts to enforce the sale.

The evidence in this case fairly interpreted means that Partee and Dalton, the real estate agents, and Flowers knew that Crawford would not be willing to sell the land to the latter, and with that knowledge concealed

from Crawford the fact that Flowers and not Wallis was the real purchaser. Section 381, A. L. I. Rest. Agency, provides: "Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information relevant to affairs entrusted to him which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." An illustration of that section is in the following language: "A, a real estate broker acting for P, introduces to P as the real purchaser one whom he knows to be acting for a person with whom P would be unwilling to deal. A commits a breach of duty by so doing and is not entitled to commission for conducting the transaction."

Affirmed.